```
                  UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW HAMPSHIRE
```

Stephen A. Juneau

   v.                                         Civil No. 11-cv-503-SM

Michael J. Astrue, Commissioner,
Social Security Administration


## REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), Stephen Juneau moves to reverse the Commissioner's decision denying his application for Social Security disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423.  The Commissioner, in turn, moves for an order affirming his decision.  For the reasons that follow, I recommend that the decision of the Commissioner, as announced by the Administrative Law Judge ("ALJ"), be affirmed.


### Standard of Review

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if

>supported by substantial evidence, shall be conclusive
>. . . .

42 U.S.C. § 405(g). However, the court "must uphold a denial of social security disability benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'" Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts." Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)). In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). But, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991)

(citations omitted). Moreover, the court "must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988). Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## Background

The parties have submitted a Joint Statement of Material Facts, document no. 12. That statement is part of the court's record and will be summarized here, rather than repeated in full.

Juneau last worked in 2005, when he was terminated from his position as a senior systems analyst. At his hearing, he testified that he lost that job because he was not able "keep up with the multi-tasking that [his employer was] pushing on" him. Administrative Transcript ("Tr.") 28. The record indicates that since Juneau left his job as a systems analyst, he started and then abandoned a towing business and a chihuahua-breeding

business, and went to school for training in massage therapy.[1] There is little in the record to suggest that either of Juneau's business ventures failed because of the physical or mental impairment from which he claims to be disabled.[2]

Juneau has been diagnosed with diabetes, a condition he has had for approximately thirty years. He has treated his diabetes primarily with medication, but has also relied to some degree on exercise, diet, and weight loss. Juneau has also received some treatment for mental-health issues, including two visits to the Mental Health Center of Greater Manchester ("MHCGM"), in December of 2008 and January of 2010.

In December of 2009, Susan Leonard, a social worker at MHCGM, wrote the following diagnostic summary in the context of an intake protocol:

> CL is a 55 yr old married male who has a long history of alcoholism and depression but did work at a good job for 25 yrs. But the situation became more severe

---

[1] A Mental Health Evaluation Report by Dr. Janet Levenson suggests that Juneau also established and operated a consulting business after he stopped working as a systems analyst, see Tr. 226, but an intake form completed when he started receiving treatment at the Mental Health Center of Greater Manchester suggests that his consulting business pre-dated his employment as a systems analyst, see Tr. 264.

[2] At his hearing, Juneau testified that the towing business proved to be more physically taxing than he had anticipated and also proved to be less lucrative, due to high fuel prices. See Tr. 31. When discussing that business with Dr. Levenson, he "denie[d] ever turning calls down because of mental health issues." Tr. 226.

4

> when CL's mother died in 1997 and his business partners kicked him out of the business he started. Then his father passed away in 2001. CL lost his job in 2005 because he "snapped" could not "multitask", became overwhelmed – had been commuting 70 miles one way to job in Mass; did the housework too. CL is disorganized, some ADHD since school days, never diagnosed. CL was attending counseling in Mass. for 5 years. No abuse or neglect. CL is depressed and volatile, argued w policewoman, shot holes in the walls at home, spiraling out of control. Wife is working but no one does housework, client was well dressed but smelled bad, hygiene poor, states his home is dirty because no one cleans. CL is attending school for massage therapy. NO self-harming but CL keeps threatening to kill himself, still drinking every day. Sleep apnea was repaired by surgery but still using alcohol to sleep. Financial pressures, lots of debt, mounting problems. CL has guns but states he has no suicidal intentions at this time, just says it when he gets upset, still drinking regularly.
>
> . . .
>
> FUNCTIONAL ASSESSMENT: CL's functioning is minimal, is socializing and attending school, although always late, disorganized. Minimal self-care, hygiene, not managing finances.

Tr. 264. That summary resulted in diagnoses of major depressive disorder, recurrent, severe, without psychotic features; and alcohol dependence with physiological dependence.[3] See id. According to Leonard, her assessment was based exclusively on information obtained from Juneau. See id.

---

[3] At his hearing, Juneau testified that he had abstained from alcohol for the previous five months. See Tr. 32.

In November of 2009, state-agency consultant Dr. Burton Nault completed a Physical Residual Functional Capacity ("RFC") assessment on Juneau. See Tr. 217-24. In terms of exertional limitations, Dr. Nault determined that Juneau could: (1) lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; (2) stand and/or walk, and sit, both with normal breaks, for about six hours each in an eight-hour workday; and (3) push and/or pull without any limitation other than the limitations on lifting and/or carrying. Dr. Nault further determined that Juneau had no postural, manipulative, visual, communicative, or environmental limitations.

Also in November of 2009, Dr. Janet Levenson performed an examination of Juneau, at the request of the state agency, and completed a Mental Health Evaluation Report on him. See Tr. 225-30. Based on a diagnosis of dysthymic disorder,[4] Dr. Levenson determined that Juneau had the following levels of functioning: (1) no significant impairment in his capacity to perform activities of daily living; (2) no significant limitation in social functioning; (3) some difficulty with

---

[4] Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." Stedman's Medical Dictionary 602 (28th ed. 2006).

6

understanding and remembering instructions, but, "with minimal training and initial supervision . . . would be able to understand and remember locations and work-like procedures of both simple and complex nature," Tr. 228; (4) no significant impairment in his capacity for concentration and task completion; and (5) a propensity for reacting to stress by engaging in maladaptive strategies, including alcohol consumption.  She gave the following prognosis:

> Steve is ambivalent about accepting treatment.  He feels no medication has been helpful for him in the past.  He indicated that he wants to stop [drinking?] and [feels] that [he] could if he really wanted to.  He is not interested in AA.  He is functioning well currently, though would likely function slightly better if sober and his psychosocial stress (financial & plumbing issue) was reduced.  Prognosis for treatment compliance is poor as he has been non-compliant with his diabetes stabilization program and has not felt mental health interventions have been particularly helpful in the past.[5]

Tr. 229.  Dr. Levenson concluded with the following recommendations:

> Financial assistance to get the plumbing issue in his home attended to before the ground freezes.  Use of his light box as the daylight hours shorten.  Continued attendance and completion of the massage therapy program.  Employment assistance once program is completed.  Individual counseling with alcohol abuse/supportive counselor.  Psychopharm assessment.

Tr. 229-30.

---

[5] In her report, Dr. Levenson noted: "While recommended to see a psychiatrist, [Juneau] consciously hasn't followed through because he 'does not have faith in psychiatry.'"  Tr. 225-26.

7

Finally, in November of 2009, state-agency consultant Dr. Nicholas Kalfas completed a Psychiatric Review Technique form on Juneau in which he took into account affective disorders and anxiety-related disorders. <u>See</u> Tr. 239-51. With regard to affective disorders, Dr. Kalfas identified dysthymic disorder as "[a] medically determinable impairment [that was] present that [did] not precisely satisfy the diagnostic criteria" for affective disorders. Tr. 242. With regard to anxiety-related disorders, Dr. Kalfas identified general anxiety disorder as "[a] medically determinable impairment [that was] present that [did] not precisely satisfy the diagnostic criteria" for anxiety-related disorders. Tr. 244. As for functional limitations, Dr. Kalfas found mild limitations in Juneau's abilities in the areas of activities of daily living; maintaining social functioning; and maintaining concentration, persistence, and pace. He determined that Juneau had no extended episodes of decompensation. Dr. Kalfas concluded with the following notes:

> Claimant is currently embarked on yet another endeavor after leaving his employment as a systems [analyst] – that of a massage therapist and is in class 6 hrs/day, 4 days/week. There is a note from 7/04 (Dr Bulmer) indicating an adj d/o w/ depressed mood and GAD. Dr. Hanlon, his PCP Rx's Celexa.. which the claimant indicated he was not taking to Dr. Levenson (CE 11/09) as it "made him worse." Dr. Levenson does provide opinions of function.. although her one opinion regarding social function is at best tangential and is

8

>  disregarded. The content of her findings, however, are elaborate[d] sufficient[ly] so that a clear "picture" of the claimant's function can be derived. Despite his GAD/dysthemic d/o, the claimant retains useful function in all domains as noted in Section III.

Tr. 251.

After conducting a hearing, the ALJ issued a decision that includes the following relevant findings of fact and conclusions of law:

> 3. Through the date last insured, the claimant had the severe impairment of diabetes mellitus (20 CFR 404.1520(c)).
>
> . . . .
>
> 4. Through the last date insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> . . . .
>
> 5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(c).
>
> . . . .
>
> 6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).
>
> . . . .
>
> 9. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding

>of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2.
>
>10. Through the last date insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

Tr. 14, 15, 16, 17, 18.

## Discussion

While Juneau's memorandum is not a clear as it might be, he appears to argue that the ALJ's decision should be reversed, and the case remanded, because the ALJ improperly weighed the medical-opinion evidence in the case, erred in determining his RFC, and incorrectly determined that his statements about the limiting effects of his impairments were not credible.

A. The Legal Framework

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability. 42 U.S.C. §§ 423(a)(1)(A)-(D). The only question in this case is whether Juneau was under a disability.

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Moreover,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

To decide whether a claimant is disabled for the purpose of determining eligibility for disability insurance benefits, an ALJ is required to employ a five-step process.  See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform

11

>past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920, which outlines the same five-step process as the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that he is disabled. See Bowen v. Yuckert, 482 U.S. 137, 146 (1987). He must do so by a preponderance of the evidence. See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)). However,

>[o]nce the [claimant] has met his or her burden at Step 4 to show that he or she is unable to do past work due to the significant limitation, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the [claimant] can still perform. Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). If the [claimant's] limitations are exclusively exertional, then the Commissioner can meet her burden through the use of a chart contained in the Social Security regulations. 20 C.F.R. § 416.969; Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, App. 2, tables 1-3 (2001), cited in 20 C.F.R. § 416.969; Heckler v. Campbell, 461 U.S. 458 (1983). "The Grid," as it is known, consists of a matrix of the [claimant's] exertional capacity, age, education, and work experience. If the facts of the [claimant's] situation fit within the Grid's categories, the Grid "directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R. pt. 404, subpt. P, App. 2, § 200.00(a), cited in 20 C.F.R. § 416.969. However, if the claimant has nonexertional limitations (such as mental, sensory, or skin impairments, or environmental restrictions such

> as an inability to tolerate dust, id. § 200(e)) that restrict his [or her] ability to perform jobs he [or she] would otherwise be capable of performing, then the Grid is only a "framework to guide [the] decision," 20 C.F.R. § 416.969a(d) (2001). See also Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) (discussing use of Grid when applicant has nonexertional limitations).

Seavey, 276 F.3d at 5 (parallel citations omitted).  Finally,

> [i]n assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) [claimant]'s subjective claims of pain and disability as supported by the testimony of the claimant or other witness; and (3) the [claimant]'s educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

### B. Juneau's Arguments

As noted above, Juneau argues that the ALJ committed reversible error by: (1) giving inordinate weight to the opinions of Drs. Nault, Levenson, and Kalfas; (2) formulating an RFC that was not supported by substantial evidence; and (3) improperly assessing the credibility of his testimony.  The court considers each argument in turn.

#### 1. Weighing the Opinion Evidence

According to Juneau, "[t]he significant weight given to the state agency medical consultant's opinion for a full range of

13

medium work [i.e., Dr. Nault's opinion] with no severe mental impairment [i.e., Dr. Kalfas's opinion] and reliance by the ALJ [on] Dr. Levenson's examination . . . is misplaced and warrants a reversal and remand of the determination." Cl.'s Mem. of Law (doc. no. 8-1), at 6.  That argument fails for two interrelated reasons.

First, objections to an ALJ's weighing of medical opinions typically take the form of a claimant arguing that an ALJ gave too much weight to an unfavorable opinion from a non-examining source and gave too little weight to a more favorable opinion from an examining source or a treating source.  Here, however, the medical opinions to which the ALJ gave "significant weight," Tr. 17, are the only medical opinions in the record.  Juneau has produced some treatment records, but has produced no "statements from [treating] physicians [or] psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [his] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).  Thus, he has produced no treating-source medical opinions.  See id.

For Juneau to mount any kind of argument based on the weight the ALJ gave to the medical opinions, see 20 C.F.R. §

14

404.1527 (describing the way in which the Commissioner is to evaluate opinion evidence), it was incumbent on him to produce medical opinions from which the ALJ could have crafted a more favorable RFC, see Bowen, 482 U.S. at 146 (pointing out the claimant's burden to demonstrate disability). Without producing any opinion evidence contrary the opinions of the state-agency consultants, there was no counterweight to the opinions on which the ALJ relied. Necessarily, then, the ALJ could not have misweighed the medical opinions.[6]

Beyond that, the crux of Juneau's argument is this: "I would submit that an inappropriate amount of weight was given to the state agency reports as opposed to the medical records of Susan Leonard which depict a much more limit[ed] ability to complete day to day activities, inability to properly function in any type of a work setting and is more consistent with

---

[6] Toward the end of his memorandum of law, Juneau notes that "[a]n ALJ must give 'specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewer[s] . . . the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight.'" Cl.'s Mem. of Law (doc. no. 8-1), at 9 (quoting SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996)). That is obviously a correct statement of the law but it is inapplicable to this case, given that the record includes no opinions from any of Juneau's treating sources.

[Juneau]'s testimony at the hearing."[7] Cl.'s Mem. of Law (doc. no 8-1), at 7. There are at least three problems with that argument.

First, it is not at all clear that Leonard, as a social worker, is an acceptable medical source, see 20 C.F.R. § 404.1513(a)(2), qualified to offer an opinion on the limiting effects of Juneau's mental impairment, see 20 C.F.R. § 404.1527(a)(2). Second, given Leonard's notation that her diagnostic summary was based entirely on Juneau's reporting, that summary does not qualify as either a medical opinion, see Reeves v. Barnhart, 263 F. Supp. 2d 154, 161 (D. Mass. 2003), or an objective medical finding, see Craig v. Chater, 76 F.3d 585, 590 n.2 (4th Cir. 1996). Finally, even if that summary did qualify as medical evidence, as Juneau would characterize it, the ALJ did not commit reversible error, but in fact avoided reversible error, by not relying on it. That is because it is well established that "as a lay factfinder, an ALJ lacks sufficient expertise to interpret [raw medical] data." Rivera

---

[7] Notwithstanding his suggestion that Leonard's medical records depict him as unable to properly function in any type of a work setting, Juneau does not direct the court to any analysis of his capacity for work-related activities in Leonard's records. Those records, in turn, appear to have been generated entirely by the intake process at MHCGM, which calls into question their status as "treatment records." See 20 C.F.R. § 404.1527(d)(1) (describing the value of treating-source opinions as deriving from the length and depth of the treatment relationship).

v. Comm'r of Soc. Sec., 181 F.3d 80 (unpublished table decision), 1998 WL 1085690, at *1 (citing Rivera-Figueroa v. Sec'y of HHS, 858 F.2d 48, 52 (1st Cir. 1988) (per curiam); Berrios v. Sec'y of HHS, 796 F.2d 574, 576 (1st Cir. 1986) (per curiam)).  For that reason, the balancing test Juneau would have had the ALJ perform, placing the three medical opinions on one side and his Leonard's diagnostic summary on the other, is legally impermissible.

### 2. The ALJ's RFC Assessment

Juneau's next argument is that when determining his RFC, "[t]he ALJ fail[ed] to give proper weight to the medical records that paint a more debilitating picture of [him] and is more consistent with the testimony during the hearing as well as the negative effects upon his activities of daily living."  Cl.'s Mem. of Law (doc. no. 8-1), at 7.  The court presumes that by "medical records," Juneau is referring to Leonard's diagnostic summary, quoted above, and a one-paragraph "Brief Summary of Content/Therapeutic Intervention" written after his second visit to MHCGM on January 11, 2010, by Mike Bradley.  Juneau's argument is unavailing.

In an opinion that Juneau cites in his memorandum of law, the court of appeals for this circuit explained that "[w]ith few exceptions . . ., an ALJ, as a lay person, is not qualified to

17

interpret raw data in a medical record." Manso-Pizarro, 76 F.3d at 17 (citing Perez v. Sec'y of HHS, 958 F.2d 445, 446 (1st Cir. 1991); Gordils v. Sec'y of HHS, 921 F.2d 327, 329 (1st Cir. 1990)). In other words, it is the function of a medical expert, not an ALJ, to explain how a claimant's impairments affect his or her capacity for performing work-related activities. When there are conflicting medical opinions, it is the ALJ's responsibility to resolve the conflict, see Irlanda Ortiz, 955 F.2d at 769, but it is beyond the competence of an ALJ, in the first instance, to transform medical data such as Leonard's diagnostic summary and Bradley's brief summary into an RFC. So, again, the ALJ did not commit reversible error, but avoided it, by declining to base his RFC determination on the medical evidence Juneau says he should have considered but did not.

### 3. The ALJ's Credibility Assessment

Finally, Juneau argues that "the ALJ erred in finding [his] testimony . . . not credible." Cl.'s Mem. of Law (doc. no. 8-1), at 8. But that single statement is the only thing Juneau says about the ALJ's credibility assessment. He does not identify the legal standards for evaluating the credibility of a claimant's statements about his or her symptoms, and he does not say how the ALJ violated those standards. Based on its review of the ALJ's decision, undertaken without any guidance from

Juneau, the court can find no fault with the ALJ's credibility assessment.  See Irlanda Ortiz, 955 F.2d at 769 ("[i]t is the responsibility of the [Commissioner] to determine issues of credibility").  Certainly, an ALJ's credibility determination may be reversed, but first, a claimant must identify a legal or factual error on the part of the ALJ.  Here, Juneau has failed to do so.  Accordingly, his third argument fails.

## Conclusion

Because the ALJ has committed neither a legal nor a factual error in evaluating Juneau's claim, see Manso-Pizarro, 76 F.3d at 16, I recommend that: (1) Juneau's motion for an order reversing the Commissioner's decision, document no. 8, be denied; and (2) the Commissioner's motion for an order affirming his decision, document no. 9, be granted

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011), cert. denied, 181 L. Ed. 2d 268 (2012); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to

magistrate judge's report are subject to review by district court; issues not preserved by such objection are precluded on appeal).

                                              _____
                                              Landya McCafferty
                                              United States Magistrate Judge

April 30, 2012

cc:  Robert J. Rabuck, Esq.
     John A. Wolkowski, Esq.